2 So.3d 221 (2009)
Thomas William RIGTERINK, Appellant,
v.
STATE of Florida, Appellee.
No. SC05-2162.
Supreme Court of Florida.
January 30, 2009.
*226 Andrea M. Norgard and Robert A. Norgard of Norgard and Norgard, Bartow, FL, for Appellant.
*227 Bill McCollum, Attorney General, Tallahassee, Florida, and Scott A. Browne, Assistant Attorney General, Tampa, FL, for Appellee.
PER CURIAM.
Thomas William Rigterink appeals his convictions for first-degree murder and sentences of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons provided in our analysis, we reverse Rigterink's convictions and sentences and remand for a new capital proceeding.

I. BACKGROUND
This case involves the stabbing and murder of Jeremy Jarvis and Allison Sousa, which occurred in a in a dual-use[1] warehouse complex in Polk County, Florida, on September 24, 2003. After an investigation by the Polk County Sheriff's Office ("PCSO"), Rigterink was indicted for these offenses on November 4, 2003.
On September 9, 2005, the jury found Rigterink guilty as to each count of first-degree murder. Following the penalty phase, the jury recommended a death sentence for each murder through two seven-to-five votes. The trial court later held a hearing pursuant to Spencer v. State, 615 So.2d 688 (Fla.1993).[2] At the ensuing sentencing hearing, which was held on October 14, 2005, the trial court adopted the jury's death recommendations. With regard to the murder of victim Jarvis, the trial court found the following aggravators:
(1) Rigterink's prior conviction of another capital felony or a felony involving the use or threat of violence to a person (i.e., the contemporaneous murder of victim Sousa) (great weight);[3] and
(2) The murder of victim Jarvis was especially heinous, atrocious, or cruel ("HAC") (great weight).[4]
With regard to the murder of victim Sousa, the trial court found the following aggravators:
(1) Rigterink's prior conviction of another capital felony or a felony involving the use or threat of violence to a person (i.e., the contemporaneous murder of victim Jarvis) (great weight);
(2) Rigterink murdered victim Sousa to avoid or prevent a lawful arrest (great weight);[5] and
(3) HAC (great weight).
The trial court found one statutory mitigator  no significant history of prior criminal activity[6]  but only assigned this mitigation "some weight" because of Rigterink's admissions that he has: (a) used illegal drugs, primarily marijuana, since his late teens; (b) stolen from his former employer; and (c) driven with a suspended driver's license. The trial court also found and considered twelve nonstatutory *228 mitigators.[7] Rigterink later filed a timely notice of appeal with this Court.
The evidence presented during Rigterink's trial for these offenses revealed the following facts.

A. The Murders of Jeremy Jarvis and Allison Sousa
Shortly after 3:00 p.m. on September 24, 2003, a male in his late twenties to early thirties, who fit the general description of Rigterink, attacked victim Jeremy Jarvis with a ten-to-eleven-inch knife. The attack began inside the warehouse residence of Jarvis, which was located in the fifth unit of the complex, and eventually moved outside. A male eyewitness testified that as he drove past this location, he slowed his vehicle and viewed two men-one, an apparent attacker, standing above another, an apparent victim. The victim was lying on the sidewalk immediately in front of one of the building units. The witness's attention was drawn to the men because he saw red or crimson on the victim's clothing. It appeared that the attacker was attempting to drag the victim into the last unit of the building. As the victim struggled to free himself, the attacker grabbed him and tore off his T-shirt. When the victim fled toward the first unit of the complex, the witness observed a significant amount of blood flowing from wounds on his chest. The witness observed the victim approach and open the door of the first unit, while the attacker  who was "about halfway down" the sidewalk at this point  remained in pursuit. According to the witness, the victim was a 5'8" male, in his late twenties to early thirties, between 150 and 200 pounds, with dark brown hair, and the attacker was a 6'0" to 6'3" male in his late 20s to early 30s, between 150 and 200 pounds, with dark brown hair. These general descriptions are consistent with the physical characteristics and appearance of Jarvis and defendant-appellant Rigterink on September 24, 2003. Further, the attacker wore a white T-shirt and dark-colored shorts, which is consistent with the clothing Rigterink later admitted that he wore on the afternoon of September 24.
At the time, units 1 and 2 of this dual-use warehouse complex served as the office of a construction business. A second victim, Allison Sousa, and a female eyewitness were both secretaries at this establishment, and each woman was working on Wednesday, September 24, 2003. That afternoon, Sousa and the female witness heard screaming outside of the construction office. They approached and opened the door of unit 1, and a dirty, sweaty, bloody, and shirtless male  who was later identified as the first victim, Jeremy Jarvis  entered the office and sat down in a chair near the door. The female eyewitness testified that Jarvis appeared to be experiencing serious blood loss from a wound on the right side of his chest. The witness remained composed at this point, but Sousa was "more frantic." Sousa began to care for the man and to call 911. She instructed the female witness to go to the office kitchen in the back to obtain some towels to address the obvious injuries *229 that Jarvis had sustained. The witness obeyed, and as she began to return to the front of unit 1, the witness heard the door slam. She continued forward toward a pass-through window located between the main-office and lobby areas. Through this window, the witness observed a second male aggressively approaching Sousa. At this point, Sousa was approximately six feet away from the witness on the other side of the window. The witness saw that Sousa was still attempting to call 911, and she also caught a glimpse of the second man's profile and a side view of his body. At trial, she described him as a white male, early-to-late twenties, with dark hair, wearing a long white T-shirt and dark shorts, about 6'3", 170 pounds, with an olive or tan complexion, and no facial hair or hair on his forearms. With the possible exception of the hairless forearms, this description is consistent with Rigterink's appearance on September 24, 2003. The witness could not see whether the second man had anything in his hands, but she felt that he was "going after" Sousa and that he had seen her (the witness) approach the window. For that reason, the witness fled to an office located further toward the rear of unit 1. As the witness ran, she heard Sousa scream, "Don't hurt me. Don't hurt me." When the witness reached the rear office, she closed the door, locked the deadbolt, and dialed 911.
The PCSO received two 911 calls from this location on September 24, 2003. The dispatcher received Sousa's call at 3:07:37 p.m. and received the female eyewitness's call at 3:07:46 p.m. The recording of the first call reveals:
911 Operator: "911. What's your emergency? Hello?"
911 Caller: "Oh, my God. Don't  don't hurt me. No...."
The dispatcher then heard "people ... throwing something around" and afterward total silence. The line remained open for four minutes. During the second 911 call, the female witness told the dispatcher that an injured man entered her office and that another man was then in the process of breaking in and attempting to hurt her coworker, Allison Sousa. The caller further stated that at least one of the men had been stabbed and she feared that something terrible was happening to Sousa. The witness later requested an ambulance, and she provided a consistent description of the attacker: He was wearing a white T-shirt, dark shorts and was probably over six feet tall. The dispatcher remained on the line for several minutes with the witness until PCSO deputies arrived and the dispatcher confirmed, their identities. At trial, the female eyewitness testified that during the 911 call, she heard scuffling, banging, and impacts against the walls within unit 1. She later heard someone rub against the walls and attempt to gain access to the rear office in which she was hiding. She only opened the door and emerged from the office once PCSO deputies had arrived and secured the crime scene. After exiting unit 1, the witness provided a contemporaneous statement to PCSO investigators in which she described the attacker as a white male between 6'0" and 6'2", 160-170 pounds, tanned skin, black wavy hair,[8] no facial hair, and wearing a light-colored T-shirt with dark shorts.
When PCSO personnel arrived, they secured the entire complex and discovered the lifeless bodies of Jarvis and Sousa in *230 the rear-warehouse area of unit 1. PCSO crime-scene technicians ("CSTs"), and later three blood-spatter technicians from the Florida Department of Law Enforcement ("FDLE"), processed the collective crime scene for the next several days. During the guilt and penalty phases of Rigterink's subsequent trial for these murders, the medical examiners established that the attacker stabbed or cut Jarvis a total of twenty-two times and stabbed or cut Sousa a total of six times. Both victims had several injuries to their hands and limbs that were consistent with defensive wounds. Of the twenty-two wounds inflicted upon Jarvis, four were fatal: three to his right lung, which led to its eventual collapse and internal and external bleeding; and one to his abdomen, which penetrated his stomach and produced internal and external bleeding. Of the six wounds sustained by Sousa, two were fatal: one just above her left breast, which completely severed her pulmonary trunk, a major blood vessel; and one to her to abdomen, which struck and damaged her liver. Both of Sousa's fatal wounds led to large amounts of internal bleeding.
Inside unit 1 (the office of Sousa's employer), the CSTs encountered abundant evidence of a bloody, vicious attack. Both sides of the entry door to unit 1 were smeared with blood. There was a large pool of blood near the entrance, as if someone had been standing or sitting there while bleeding heavily, which is consistent with testimony that Jarvis sat in a chair near the entrance while Sousa attempted to dial 911. The CSTs also found a blood-smeared gumball dispenser in the lobby, which was overturned, separated from its base, and surrounded by apparent vomit. The heavy blood stains on the walls and doors of unit 1 were consistent with someone forcefully pushing another  who was bleeding profusely  against these surfaces. There were also numerous blood-spatter cast-off arcs, which were consistent with the attacker using a bloody knife to repeatedly strike the victims. Further, the pass-through window and the entire hallway leading through unit 1 were smeared with blood. In the main-office area, there was a large pool of blood under a desk as if one of the victims had sought refuge there. A phone on top of the desk was off the hook and dangling from its cord just above the floor. A veritable trail of blood continued down the hallway into the kitchen area, where large amounts of blood were smeared on a refrigerator, a trash bin, and some of the cabinets. Continuing along this trail of blood toward the rear of the unit, the door between the rear-office and warehouse areas had been damaged along with its locking mechanism and frame. This damage was consistent with someone attempting to charge or crash through the door to gain access to the rear-warehouse area of the construction office. Additionally, there were bloody, smeared palm prints on the door. The blood trail finally ended in the rear-warehouse area near the bodies of Jarvis and Sousa. The medical examiners established that the two victims were conscious for several minutes, were aware of their injuries and experienced intense pain, and eventually bled to death. The victims' wounds were consistent with the attacker stabbing or cutting them with a ten- or eleven-inch blade.
Inside unit 5 (the residence of Jarvis), the CSTs discovered large blood smears on the wall adjacent to the entryway  consistent with the conclusion that a struggle occurred in that area. Blood also covered much of the flooring. Furniture, including a sofa, was overturned and in disarray. A trail of blood droplets led from unit 5 along the sidewalk to the entrance of unit 1. FDLE personnel developed two bloody latent fingerprints on the *231 inside of the door to unit 5, which were later determined to match Rigterink's relevant print patterns. Fingerprint analyst Patricia Newton testified that the photographs of these prints recorded their unique pattern and that the prints were consistent with the print-donor's fingers having already been covered in blood and the donor then touching the door, rather than the surface of the door having blood on it with the print-donor merely touching the freshly deposited blood. At various locations hidden inside unit 5 (e.g., under the overturned sofa, under Jarvis's mattress, and inside a laundry hamper), the CSTs found three to five pounds of marijuana with a street value of several thousand dollars. Additionally, the CSTs recovered $429 from Jarvis's right-front pocket. Jarvis's mobile phone was the final significant item of evidence that the PCSO discovered in unit 5. Detective Jerry Connolly, the lead detective on this case, and other PCSO investigators eventually used this phone, and associated phone records, to compile a list of Jarvis's known associates, whom PCSO investigators viewed as the primary leads to solving this case.

B. The Resulting Murder Investigation
Using the call log on Jarvis's mobile phone, along with the phone records that the PCSO later obtained from Jarvis' service provider, Detective Connolly and his colleagues began to establish contact with Jarvis's known associates. One of the first associates that they contacted was Marshall Mark Mullins. Either late during the night of September 24, 2003, or the early morning of September 25, Detective Connolly and a group of PCSO detectives, including Det. Scott Rench, contacted Mullins at his home. The detectives roused Mullins and questioned him with regard to his whereabouts during the afternoon of September 24, 2003. Mullins provided a complete alibi. He explained that he worked for R & R Heating and Cooling and that during the afternoon of September 24, 2003, he had been completing an HVAC installation at a residence in Lake Wales. Mullins also stated that his employer  the owner of R & R  was with him the entire time. Later, during the day on September 25, 2003, Detective Connolly confirmed this alibi with both the employer and the Lake Wales homeowner. The employer also produced an invoice corroborating that he and Mullins completed the Lake Wales project on September 24, 2003.
During Mullins' recorded statements to PCSO investigators, he never implicated himself in the Jarvis-Sousa murders in any way. Moreover, Mullins' fingerprints did not match any of the bloody latent prints obtained from the crime scene. According to the testimony of Rigterink's former girlfriend,[9] Rigterink received a voicemail message from Mullins sometime during the evening of September 24, 2003. On the tape, Mullins said, "Tom, this is your buddy, Mark. I think our buddy, Jeremy [Jarvis], has been shot." Later, during April of 2004, Mullins was killed in an automobile accident. Since Mullins appeared to be a fruitless lead, the PCSO detectives moved on to other known associates of Jarvis. One of those associates was Rigterink.
At approximately 11:30 a.m. on the morning of September 25, 2003 (the day following the murders), two detectives from the PCSO cold-case squad, who had been assigned to assist in the Jarvis-Sousa *232 murder investigation, went to Rigterink's condominium ("condo") and knocked on the door. They were interested in this location because of phone calls between a phone located at this address and Jarvis's mobile phone, which occurred on the day of the murders. A dog barked, but no one responded to the door. The detectives could not see anyone through the doors or windows of the residence. The only vehicle that the detectives observed at the condo was a Jeep registered to Rigterink. The detectives parked their unmarked car in a position some 200 feet away from the condo where they could observe the front of the building. From that location, they conducted surveillance for several hours. They did not observe any vehicles or persons approach or exit the front of the condo.
While they waited outside, the detectives contacted Rigterink's parents, who agreed to bring him to his condo for an interview. Rigterink arrived at 7:30 p.m. and invited the detectives inside. At approximately 7:45 p.m., two additional detectives (Ivan Navarro and Tracy Smith) arrived to question Rigterink. Rigterink explained that on the previous day, September 24, 2003, he had been in class at Warner Southern College from 8 a.m. until noon. After Rigterink returned home, he called Jarvis to purchase some marijuana. He also stated that sometime after 2 p.m., he had another phone conversation with Jarvis concerning the same topic. Rigterink explained that during this second call, Jarvis told Rigterink that he was on his way to Lakeland to pick up a new batch of marijuana. As part of this questioning, Rigterink volunteered the names of three additional known associates of Jarvis  including Marshall Mark Mullins  who were also allegedly involved in the drug trade. Rigterink was calm and collected during the entire interview. He did not exhibit any signs of fear or anxiety, nor did he react with any apparent emotion to the news that his friend or acquaintance, Jeremy Jarvis, had been murdered. Further, Rigterink specifically denied that he had any personal, face-to-face contact with Jarvis on the day of the murders. As part of this visit, Rigterink provided consent for the police to search his Jeep and to "look around" his condo. None of the detectives observed any cuts or injuries to Rigterink's person on September 25.
PCSO investigators next made contact with Rigterink on October 9, 2003. By this time, the PCSO  with FDLE assistance  had been able to obtain suitable photographs of the bloody latent prints recovered from the front door of unit 5, and they were in the process of obtaining "elimination prints" from all known associates of Jarvis to rule them out as suspects in the ongoing murder investigation. On October 9, Detective Connolly spoke with Rigterink in his condo. The two men discussed Rigterink's dealings with Jarvis in regard to purchasing marijuana and the timeframe during which Rigterink had placed the phone calls to Jarvis on the day of the murders. Rigterink agreed to visit the PCSO the next day, October 10, 2003, to provide "elimination prints," but never appeared for that appointment.
At 4:30 p.m. on October 10, Rigterink called Detective Connolly to explain that he would not be able to provide his fingerprints that day due to a lack of transportation. As an alternative, Rigterink offered to appear the following Monday, October 13, 2003. Rigterink also failed to appear on the 13th; instead, he took his former girlfriend to the beach. On October 14 and 15, the PCSO investigators were unable to establish contact with Rigterink at his condo or through his friends and family. During the evening of October 14, 2003, Rigterink's former girlfriend used her key to enter Rigterink's condo to feed *233 his dog. Inside, she discovered that Rigterink had barricaded himself inside his bathroom. She was frightened because she thought that Rigterink was dead or that something awful had happened to him. Rigterink and his former girlfriend then traveled to her home, went for a ride in her car, and had a conversation during which Rigterink explained to her that everything was going to be fine. Later that night, Rigterink's former girlfriend dropped him off at his parents' home. At trial, Rigterink testified that he then decided to hide on his parents' roof:
The house is such that there are solar panels on the flat part of the roof over... the porch ... and it's basically like a tent, and that's where I hid. And ... I figured ... no one would think to look up there. I would be safe, and I could sort of watch who came and went at their house.
While on the roof, Rigterink saw the PCSO investigators come and go on October 15, 2003. During this time, the PCSO obtained an executed consent-search form to impound and search a 1992 blue Toyota pickup that belonged to Rigterink's father. Using a chemical called Luminol, the CSTs later discovered blood near the driver-side door, armrest, seatbelt and seatbelt assembly, steering wheel and column, and the passenger-side floorboard area. At trial, Rigterink admitted that he borrowed his father's blue Toyota pickup on Monday, September 22, 2003, and that he continued driving the truck until Wednesday, September 24, 2003. The PCSO investigators were not aware of this information at the time, but the blood found inside the truck was genetically consistent with that of Jarvis. According to the relevant FBI DNA database, the frequency occurrence of the driver-side door sample was 32 quadrillion to one in the Caucasian population. The frequency occurrence of one of the seatbelt samples produced the same statistical probability. The remaining samples were consistent with mixtures of Rigterink's and Jarvis's blood, but excluded Sousa as a possible donor.[10]
On the morning of October 16, 2003, from his perch on the roof, Rigterink saw his mother, Nancy, who appeared to be distressed. Rigterink descended from the roof to comfort her. At approximately 10 a.m. on the 16th, Nancy called Detective Connolly and explained that Rigterink was ready to speak with the PCSO investigators. When Detective Connolly and other investigators arrived, Rigterink had just finished a shower and, while he dressed, Rigterink told Detective Connolly that two men from Lake Wales who sold "ice" (i.e., methamphetamines) might have murdered Jarvis and Sousa. After some discussion, Rigterink agreed to accompany the police to the PCSO Bureau of Criminal Investigations ("BCI") to provide "elimination prints." Rigterink was driven by his parents to the BCI office.
After Rigterink provided "elimination prints," he was interviewed by a group of PCSO detectives. Following several hours of questioning-which included repeated accusations of dissembling and the disclosure that Rigterink's fingerprints matched those discovered in blood at the crime scene  Rigterink eventually admitted in a videotaped statement that (1) he traveled to the dual-use warehouse complex on September 24, 2003, to purchase marijuana from Jarvis; (2) he struggled with Jarvis while holding a large knife, but did not recall stabbing anyone; (3) he pursued Jarvis into unit 1; (4) he recalled certain *234 aspects of these events, but his memories appeared as disjointed "Polaroid snapshots"; (5) he eventually discovered Sousa's body and "freaked out"; and (6) in the midst of "hauling ass" away from the warehouse complex, he disposed of the bloody knife and a black Jansport backpack  which contained his bloody clothing-by throwing these items off of a bridge. At the conclusion of this interrogation, PCSO personnel arrested Rigterink for the murders of Jarvis and Sousa.

C. Rigterink's Confession and Trial Testimony

i. Attempted Suppression
On August 20, 2004, before Rigterink's eventual trial for these murders, he moved to suppress all statements that he made during the videotaped portion of his October 16, 2003, confession. Rigterink contended that these statements should be suppressed because the written and verbal Miranda[11] warnings provided by the PCSO detectives were materially defective. Specifically, Rigterink challenged the verbal and written right-to-counsel warnings he received because each advised him that he only had "the right to have an attorney present prior to questioning." (Emphasis supplied.) The initial trial judge and a successor trial judge each denied the motion to suppress on the ground that Rigterink was not in custody and, therefore, was not entitled to any Miranda warnings. Rigterink also objected to the admission and publication of the videotaped confession at trial, which the court overruled.
In total, the October 16 police interview or interrogation continued for over four hours as Rigterink remained in the same small room. However, the unrecorded portion of the interrogation, which was not challenged, covered from approximately 11 a.m. until 2:24 p.m. (roughly 3.5 hours). During the suppression hearing, Rigterink contended that while he initially traveled to the BCI office voluntarily to provide "elimination prints" and to speak with the PCSO investigators, the interrogation became custodial when the police (1) confronted him with tangible, circumstantial evidence of his guilt and repeatedly accused him of lying, and (2) read him his rights pursuant to Miranda.

ii. The Unrecorded, Unchallenged Portion of the Interrogation  Rigterink's First, Second, and Third Stories
The non-taped portion of the October 16, 2003, interview or interrogation constituted the majority of the police questioning and, again, has not been challenged below or on appeal. During the suppression hearing, Detective Connolly was the only witness to testify on behalf of either party. Connolly testified that after attempting to reach Rigterink from October 9, 2003, until October 15, 2003, the PCSO investigators were finally able to reestablish contact with him in order to obtain his "elimination prints."
While the police were waiting for fingerprint analysts to compare Rigterink's fingerprints to the bloody latent prints discovered at the crime scene, Rigterink was taken to a six-by-eight, sound-insulated interrogation room, which contained three chairs and a small desk. Initially, Detectives Connolly, Rench,[12] and Raczynski were all inside this small room with Rigterink.[13] Connolly testified that the interrogation-room *235 door was closed but not locked. PCSO personnel instructed Rigterink's parents to remain waiting in the lobby. Rigterink was not handcuffed or restrained during the interrogation.
During the unrecorded portions of the interrogation, Rigterink provided three irreconcilable stories in response to repeated accusations from the detectives that he was lying with regard to his activities and whereabouts on the day of the murders. First, Rigterink claimed that he called Jarvis to establish a marijuana deal on September 24, 2003 (the day of the murders), but he never actually went to Jarvis's home that day. At the conclusion of his first story, the detectives accused Rigterink of lying. In response, Rigterink offered a different version of the facts: He traveled to Jarvis's home on the day of the murders, completed a purchase of marijuana, and left at a time when Jarvis was alone and unharmed. At the conclusion of Rigterink's second story, the detectives again stated that he was lying and that he was somehow involved with these murders.
The detectives finally decided to confront Rigterink with the fact that two of his fingerprints matched the bloody latent prints recovered from the crime scene. After being confronted with the fingerprint match, Rigterink provided a still different version of the facts. In this third rendition, Rigterink stated that he arrived after the murders occurred. Specifically, he claimed that when he approached unit 5, he saw blood smeared over the entryway. Rigterink then walked inside unit 5 and "touched everything" in the process of looking for Jarvis. He was unable to find Jarvis in unit 5, so he exited. Once outside, he noticed a blood trail leading from unit 5 to unit 1, so he followed the trail until he arrived at unit 1. He entered unit 1 and observed a large amount of blood and two people lying on the floor. Rigterink then approached the bodies and checked both of their pulses. He could not find a pulse on either victim. At this point, Rigterink realized that he was covered in blood and became scared, so he fled and drove home. Rigterink could not explain why he was covered in blood. He did not call 911 because he was frightened. Rigterink estimated that he spent only five minutes at the crime scene.
At the conclusion of his third story, the detectives again accused Rigterink of lying with regard to his involvement in these murders. Rigterink then replied that he would tell the detectives "the whole truth." Detective Connolly testified that Rigterink was responsive and alert throughout this process. It was only after Rigterink had agreed to "tell the whole truth," that Detective Connolly verbally advised him of his Miranda rights and requested that he read and sign a rights-waiver form to ensure the admissibility of his confession. As further explained in our analysis, both the verbal and written explanations of Rigterink's "Fifth Amendment" right to counsel were defective based on our decision in State v. Powell, 998 So.2d 531 (Fla. 2008), because these explanations only stated that Rigterink had a right to counsel "prior to" questioning. Once Rigterink was read his Miranda rights  which included a defective explanation of his right to counsel  Detective Connolly turned on a hidden recording device and microphone located within the interview room.

iii. The Recorded, Challenged Portion of the Interrogation  Rigterink's Fourth Story[14]
Rigterink challenges only the admissibility of the recorded portion of his lengthy *236 October 16, 2003, interrogation. The interrogation continued for approximately 3.5 hours before Rigterink received Miranda warnings. During the recording of Rigterink's confession, which was entered into evidence as State's exhibit 462, Rigterink first claimed that he was suffering from a case of food poisoning during the morning of September 24, 2003. He awoke at around 7 a.m. and called Jarvis at approximately noon. The call was "[a]bout hooking up. And [Jarvis] said he had to go to Lakeland, he'd try to get there fast. And [Rigterink] said, why don't you go ahead and go, and I'll come over after." "Hooking up," meant purchasing marijuana. Rigterink claimed that he later discovered Jarvis was also involved in the methamphetamine trade. At approximately 2:30 p.m. on September 24th, Jarvis returned Rigterink's call and informed him that the marijuana was available. Rigterink then drove his father's blue 1992 Toyota pickup to the warehouse complex. That day, Rigterink was wearing "[b]lack shorts and a gray shirt and tennis shoes" and a floppy desert-camouflage hat.
When Rigterink traveled to Jarvis's home on the 24th, he carried a black Jansport backpack in which he placed a black hunting knife with a ten- or eleven-inch blade that began straight but curved toward its tip. Rigterink also carried an off-white Nike T-shirt inside this backpack, which he planned to wear later that afternoon. At that point, Rigterink had owned the knife for approximately ten years. When Rigterink arrived at the complex, he parked immediately outside unit 5. Rigterink was unaccompanied and he explained to the detectives that he always carried a bag with him to Jarvis's home to conceal his marijuana purchases. Jarvis's front door was partially open, but Rigterink knocked nonetheless, and Jarvis allowed him to enter. Rigterink and Jarvis did not consume any drugs or alcohol during this visit. However, Rigterink claimed that he was still somewhat ill from his case of food poisoning.
Rigterink described the remaining events through a series of five "Polaroid snapshots." Once he entered unit 5, he and Jarvis spoke briefly about the new batch of marijuana, and then Jarvis began to reach under his sofa to retrieve something. This is the last thing that Rigterink remembered before being "locked up" in a struggle with Jarvis near the front door of unit 5. In the midst of the interrogation, Rigterink offered to draw a diagram to accompany his verbal and physical descriptions of these events. This diagram was eventually entered into evidence as State's exhibit 466. As part of the first "Polaroid snapshot," Rigterink stated that he saw himself "locked up" with Jarvis and perceived that he had the hunting knife in his hand and that he was covered in blood. Rigterink claimed that he did not realize that Jarvis had been stabbed until they both exited unit 5, and Jarvis pulled off his T-shirt, thereby exposing his wounds.
When they moved outside, Rigterink saw himself standing, while Jarvis was kneeling, which is consistent with the testimony of the male eyewitness presented at trial. Rigterink could not remember if he was attempting to help or harm Jarvis. Rigterink then recalled a second "Polaroid snapshot":
I remember being there. I can tell you exactly the position we were in.... And I remember I was holding onto him. I don't know if I had the knife in *237 my hand because I thought I had him with two hands, but I know I still had the knife in my hand, holding onto him. And the next thing I remember  I don't  I don't remember at all.... [A]nd in any event, the next thing I remember is running. I think I was right behind him.
He then transitioned to a third "Polaroid snapshot," this time within unit 1: "And the ... next image I have is [Jarvis] swinging a bubble gum dispenser at me." Rigterink claimed that he was not bruised or cut the next day, but he felt as though he had sprained his wrist. He agreed that his sprain might have been from the "jarring" of the knife. Rigterink then recalled a fourth "Polaroid snapshot": He ran down a long hallway in unit 1 and "jumped into" or "ran through" the doorway separating the rear-office area from the warehouse area. Rigterink said that he may have injured his wrist by hitting the door.
Rigterink then segued into his fifth "Polaroid snapshot": "And the last thing I remember is looking at the girl [Allison Sousa]. I didn't even see Jeremy [Jarvis] in the back room. And then I hauled ass." Rigterink claimed that he checked Sousa's pulse. He did not know if she had one because he was "freaked out." Rigterink was emphatic that he did not remember stabbing either victim. He did not remember seeing Jarvis after the third "Polaroid snapshot." When asked about the issue of paying for the marijuana that day, Rigterink claimed that Jarvis was simply going to give him the marijuana free of charge.
After these events, Rigterink claimed that he removed his bloody shirt and ran back into unit 1 to retrieve the backpack before leaving. Rigterink then opined to the interrogating detectives that he had self-diagnosed potential psychological problems. He did not remember any type of argument with Jarvis; rather, he claimed that he simply "blacked out." He stated that on at least two prior occasions he had blacked out and severely beaten others: once in Miami and once in Tampa. For a time, he consulted a drug-rehabilitation therapist  Julie Dantzler  but he was "above her head." He suggested that his conduct was related to his self-diagnosed mental-health problems.
Rigterink then described his drive away from the crime scene: "I remember being at [a traffic] light and looking down and being covered in blood." When Rigterink looked down and discovered that he was covered in blood, he thought "[w]hat the f*ck happened." At that moment, he determined that it would be best to get rid of the knife and the backpack because they were "obviously evidence at that time that something had happened." Rigterink claimed that he threw the knife and the black backpack over a bridge that he crossed on his way home (despite searching, the PCSO never recovered these evidentiary items). The knife and the backpack had been lying on the passenger-side floorboard of the Toyota pickup, which explains the blood that the CSTs later found in that area of the vehicle.
Once he returned home, Rigterink took a shower but he did not remember if he cleaned the Toyota pickup. With the exception of his shorts and tennis shoes, all of the clothing that he wore during the attacks was in the black Jansport backpack that he threw over the bridge. Therefore, on the following day, Thursday, September 25, 2003, he washed his shorts and shoes and placed them in a Tupperware bin in his closet. He later placed these shoes and shorts in the garbage, which was picked up on the following day, September 26, 2003 (this later action roughly coincided with the PCSO detectives' first visit to Rigterink's condo).
*238 After cleaning up on the 24th, Rigterink took his dog with him to his parents' home. The following exchange between Detective Raczynski is indicative of the type of response Rigterink offered with regard to why he did not render aid or call 911:
Raczynski: So after you left and you realize what you had done[,] did you think to maybe call somebody to make sure that [Jarvis and Sousa] were okay or what were you thinking?
Rigterink: No thought process at all.... Everything was all ... black. After the fact it was a blur. I don't remember individual actions I took or places I went or people I talked to.
Rigterink claimed that by "[t]hat Friday[, September 26, 2003,] I knew that I'd done it.... I don't remember the event but I knew what had happened." Rigterink stated that he did not discuss the killings with anyone or tell anyone what he had done.
After this information was obtained, at approximately 5:30 p.m., Detective Connolly called an assistant state attorney to ensure that he had probable cause to arrest Rigterink. Once he had the attorney's approval, Detective Connolly arrested Rigterink and placed him in PCSO custody. Rigterink's parents were still waiting in the lobby at this time, and PCSO personnel then told them that they should return home without their son. Rigterink was 32 years old when he provided his confession and, until his arrest, he was not placed in handcuffs or otherwise restrained.

iv. The Relevant Trial Testimony  Rigterink's Fifth Story
During the defense case-in-chief, Rigterink took the stand and testified in what amounted to over nine hours of combined direct, cross, and redirect examination. Through his testimony, he offered a fifth version of the facts with regard to his activities and whereabouts on Wednesday, September 24, 2003. In the process, he contradicted almost everything that he had previously told the police and, instead, claimed that he intentionally misled the PCSO investigators because Marshall Mark Mullins had threatened to kill him, his parents, and his former girlfriend if he mentioned that Mullins or an unnamed group of "others"[15] were involved in the murders of Jarvis and Sousa.
During his testimony at trial, Rigterink again admitted that he was at the crime scene, but claimed that he arrived after an apparent attack, explored unit 5, followed the blood trail to unit 1, and then ran down the hallway in unit 1 where he crashed through the doorway separating the rear-office and warehouse areas. Once inside the warehouse area, he discovered both victims. According to Rigterink, Jarvis was still alive and reached up and grabbed Rigterink's hand and arm and then slumped back to the floor. Rigterink then heard what he thought were car doors slamming shut, so he ran outside. As he exited unit 1, he saw a dirty white van drive away. When the van drove past, Rigterink made eye contact with the driver and a passenger. The driver was a taller white male, while the passenger was a shorter, stockier, shirtless man with tattoos on his upper body. Rigterink also thought that he saw movement in the rear of the van, so (in his mind) there may have been a third person in the vehicle.
In an apparent attempt to explain his unorthodox response to discovering two very bloody murder victims (one of whom *239 was an acquaintance or friend), Rigterink consistently described himself as "freaked out," and explained that he had never encountered this type of situation. He never called 911 and never told anyone about the gory, blood-filled scene that he had discovered because on the 24th he was still "freaked out," and on the 25th, Mullins allegedly visited Rigterink at his condo and issued the death threats.
Under oath, Rigterink denied: (1) owning a black hunting knife; (2) having a bag to transport marijuana; (3) owning a black Jansport backpack; (4) changing his clothes or throwing his clothes away; (5) carrying a knife or attacking either of the victims; (6) injuring his wrist; and (7) ever having been in a fight or struggle. Rigterink further claimed that the detectives suggested many of the details and evidentiary items that he identified and discussed during the interrogation. Rigterink testified that he simply "went along with" what the police wanted to hear. In his mind, if he concocted enough stories, the PCSO detectives would then see through his intentional facade and would conduct a thorough examination, which would exonerate him without requiring him to implicate Marshall Mark Mullins. In the words of Rigterink:
Well, I didn't do it, and I figured they'd be able to tell that I had nothing to do with it. As far as the knife, I never had a knife. I never got in a confrontation with Jeremy.... I figured the system would work.
In contrast to his claim that he believed the detectives would simply see though his stories, Rigterink also testified that he wanted to provide enough detail "to make it believable." Further, despite the apparently very real, very serious death threats that Mullins delivered on behalf of himself and a dangerous group of unnamed drug dealers, Rigterink had consistently provided Mullins' name to the investigating detectives when they asked him to identify additional associates of Jarvis who might have information relevant to his murder. In fact, the name "Marshall Mark Mullins" was among the first pieces of information that Rigterink provided to PCSO detectives during their first visit to speak with him on September 25, 2003. Moreover, Rigterink provided Mullins' name to law enforcement on the night of September 25 notwithstanding the fact that he claims Mullins issued the death threats that very morning.
Much of Rigterink's trial testimony was also inconsistent with the testimony of other witnesses. For example, his ex-wife testified that he always kept a large military knife with a curved tip and a ten- or eleven-inch black blade lodged between their mattress and box spring.[16] Also, both the male and female eyewitnesses testified that one man  not a group of two or three men  pursued Jarvis. An additional concern with Rigterink's testimony involved the amount of time between when the PCSO received the 911 calls (close to 3:08 p.m.)[17] and when the first responders arrived on scene (close to 3:18 p.m.), which would have made it difficult for Rigterink to have arrived after the murders occurred and to have then explored units 5 and 1 before "freaking out" and leaving all before law enforcement arrived. Finally, on cross-examination, Rigterink was not able to explain why he never called out to his *240 friend Jarvis when he entered unit 1  where the female eyewitness happened to be on the phone with the 911 dispatcher  or why he felt compelled to charge down a blood-soaked hallway and crash through a door when, by his own admission, he was not there to render aid and was unsure what had occurred in units 1 and 5.

D. Rigterink's Claims on Appeal
Rigterink's primary claim on appeal is his challenge to the admissibility of the single videotaped account of his activities and whereabouts on September 24, 2003. He does so based on the defective right-to-counsel warning provided by the interrogating detectives. In addition, he raises six other claims: (1) the trial court erred in excluding additional testimony that corroborated Rigterink's testimony concerning the violent nature of the drug trade and Mullins' alleged reputation for violence within this "community"; (2) Florida's capital-sentencing scheme is unconstitutional because the judge rather than the jury determines the sentence and the jury's recommendation need not be unanimous; (3) automatic aggravators should not bar the application of Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), to Florida's capital-sentencing scheme; (4) Florida's standard penalty-phase jury instructions unconstitutionally shift the burden to the defendant to prove that mitigating factors outweigh aggravating factors; (5) Florida's standard penalty-phase jury instructions unconstitutionally denigrate the role of the jury in violation of Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985); and (6) death by lethal injection constitutes cruel and unusual punishment.
Through prior decisions, we have rejected the majority of claims that Rigterink asserts on appeal.[18] In addition, Rigterink did not object below to the penalty-phase jury instructions or to Florida's lethal-injection protocol; hence, these claims are unpreserved for purposes of direct appeal. See, e.g., Walls v. State, 926 So.2d 1156, 1180 (Fla.2006); Harrell v. State, 894 So.2d 935, 941 (Fla.2005). Finally, because the ultimate resolution of the Miranda claim is determinative of this case, we address only that issue.
With regard to the Miranda claim, we hold: (i) that Rigterink was in custody for purposes of Miranda; (ii) that the right-to-counsel warning he received was constitutionally deficient; and (iii) that the admission and publication of his videotaped confession was harmful error. As a result of this holding, we reverse Rigterink's convictions and sentences and remand for a new capital trial.

II. ANALYSIS

A. Introduction  the Evolution of Miranda's Custody Framework
In Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), *241 the United States Supreme Court held that the Self-Incrimination Clause of the Fifth Amendment[19] applies to custodial interrogation. This Court has generally followed federal Fifth Amendment precedent in interpreting article I, section 9 of the Florida Constitution. See, e.g., Cuervo v. State, 967 So.2d 155, 160 (Fla.2007) ("Article I, section 9 of the Florida Constitution provides in pertinent part that `[n]o person shall . . . be compelled in any criminal matter to be a witness against oneself.' This fundamental right is mirrored in the Fifth Amendment to the United States Constitution."). However, unlike article I, sections 12 ("Searches and seizures") and 17 ("Excessive punishments"), section 9 does not contain a proviso that we must follow federal precedent with regard to the right against self-incrimination. Cf. Traylor v. State, 596 So.2d 957, 962 (Fla.1992) ("When called upon to decide matters of fundamental rights, Florida's state courts are bound under federalist principles to give primacy to our state Constitution and to give independent legal import to every phrase and clause contained therein.").
Thus, in this context, the federal Constitution sets the floor, not the ceiling, and this Court retains the ability to interpret the right against self-incrimination afforded by the Florida Constitution more broadly than that afforded by its federal counterpart. See, e.g., In re T.W., 551 So.2d 1186, 1191 (Fla.1989) ("State constitutions, too, are a font of individual liberties, their protections often extending beyond those required by the Supreme Court's interpretation of federal law. . . . [W]ithout [independent state law], the full realization of our liberties cannot be guaranteed." (quoting William J. Brennan, Jr., State Constitutions and the Protection of Individual Rights, 90 Harv. L.Rev. 489, 491 (1977))). This Court is the ultimate "arbiter[ ] of the meaning and extent of the safeguards provided under Florida's Constitution." Busby v. State, 894 So.2d 88, 102 (Fla.2004).
To protect this right within the "incommunicado" confines of such questioning, the United States Supreme Court created a prophylactic framework comprised of a standard list of four warnings:
Prior to any questioning, [1] the person must be warned that he has a right to remain silent, [2] that any statement he does make may be used as evidence against him, and [3] that he has a right to the presence of an attorney, [4] either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently.
Miranda, at 444, 86 S.Ct. 1602 (emphasis supplied). These warnings are not themselves federal constitutional rights;[20] rather, they are required "to dispel the compulsion inherent in custodial surroundings." 384 U.S. at 458, 86 S.Ct. 1602; see also Michigan v. Tucker, 417 U.S. 433, 444, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974).[21] *242 If the State cannot demonstrate (1) that its officers issued these warnings prior to custodial interrogation and (2) that the defendant executed a knowing, intelligent, and voluntary waiver[22] of his or her associated rights, then it "may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant" in its case in chief. Miranda, 384 U.S. at 444, 86 S.Ct. 1602; see also Oregon v. Elstad, 470 U.S. 298, 307, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985) (statements obtained in violation of Miranda are available to impeach a defendant's trial testimony). "The Miranda exclusionary rule . . . serves the Fifth Amendment [but] sweeps more broadly than the Fifth Amendment itself. It may be triggered even in the absence of a [traditional] Fifth Amendment [voluntariness] violation." Elstad, 470 U.S. at 306, 105 S.Ct. 1285.
The dictates of Miranda apply exclusively to "in-custody interrogation." Miranda, 384 U.S. at 441-42, 86 S.Ct. 1602 (emphasis supplied); see also Jones v. State, 748 So.2d 1012, 1019 (Fla.1999) ("Miranda only applies when a defendant is subject to custodial interrogation." (emphasis supplied)). Further, there is a limited public-safety exception to the rule that law-enforcement officers must first Mirandize custodial subjects prior to interrogation. See New York v. Quarles, 467 U.S. 649, 655-56, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984) (issuing this holding within the context of an on-scene arrest of a rape suspect who had discarded a firearm in or near a grocery store). For Miranda purposes, "custody" has a disjunctive meaning: "[W]e mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Miranda, 384 U.S. at 444, 86 S.Ct. 1602 (emphasis supplied). Based on this definition, Miranda applies to a broader range of situations than custodial interrogation within police stations. See, e.g., Mathis v. United States, 391 U.S. 1, 3-4, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968) (holding that Miranda applied when an IRS agent questioned a defendant who was already incarcerated in state prison concerning an unrelated offense); Orozco v. Texas, 394 U.S. 324, 326-27, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969) (holding that Miranda applied to intense police questioning of a defendant within his own bedroom).
Following Miranda, commentators and lower courts attempted to determine the proper parameters of measuring whether an interrogated suspect is in "custody," and thus entitled to Miranda warnings. See, e.g., United States v. Hall, 421 F.2d 540, 543 (2d Cir.1970) (citing Kenneth W. Graham, What Is "Custodial Interrogation?": California's Anticipatory Application of Miranda v. Arizona, 14 U.C.L.A. L.Rev. 59, 114-15 (1966), and Yale Kamisar, "Custodial Interrogation" Within the Meaning of Miranda, in Criminal Law and the Constitution 339-40 (1968), as examples of relevant scholarship). Much of this early debate centered on the meaning of Miranda's fourth footnote:
This is what we meant in Escobedo [v. Illinois, 378 U.S. 478, 490-91, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964) (a Sixth Amendment right-to-counsel decision),] when we spoke of an investigation which had focused on an accused.
*243 Miranda, 384 U.S. at 445 n. 4, 86 S.Ct. 1602 (emphasis supplied); see also 2 Wayne R. LaFave et al., Criminal Procedure § 6.6(a), at 720-23 (3d ed.2007). The Court eventually ended this debate in Beckwith v. United States, 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976), where it rejected a taxpayer's suggestion that he was "in custody" simply because IRS Intelligence Division agents had "focused" upon him as a suspect in a criminal tax-fraud investigation. The Court explained that "Miranda implicitly defined `focus,' for its purposes, as `questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way,'" which meant that "focus" alone was insufficient to trigger the requirement that the defendant receive Miranda warnings. Beckwith, 425 U.S. at 347, 96 S.Ct. 1612 (emphasis supplied) (quoting Miranda, 384 U.S. at 444, 86 S.Ct. 1602).
The Court next faced a two-fold question with regard to defining "custody" for purposes of Miranda: (1) whether the test is objective or subjective; and (2) whose perspectivethat of law enforcement or that of the defendant-is the proper point of reference. By this time, the better-reasoned decisions from the lower federal courts had already settled on an objective test, which is based on the perspective of the defendant. See, e.g., Hall, 421 F.2d at 544-45 ("The test must thus be an objective one. Clearly the [High] Court meant that something more than official interrogation must be shown. . . . [I]n the absence of actual arrest something must be said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates that they would not have heeded a request to depart or to allow the suspect to do so." (emphasis supplied)).
The United States Supreme Court explicitly adopted this objective test in Berkemer v. McCarty, 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984), where it held that
[a] policeman's unarticulated plan has no bearing on the question whether a suspect was "in custody" at a particular time; the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation.
Id. at 442, 104 S.Ct. 3138 (emphasis supplied).[23] The Court later reiterated this position in Stansbury v. California, 511 U.S. 318, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994), by stating that its "decisions make clear that the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." Id. at 323, 114 S.Ct. 1526 (emphasis supplied). However, the Court also clarified that the subjective perception or intent of the interrogating officer becomes relevant for purposes of the objective test when disclosed or articulated "by word or deed" during the course of the interrogation. Id. at 325, 114 S.Ct. 1526 (emphasis supplied). Within this objective inquiry,
[e]ven a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue, for some suspects *244 are free to come and go until the police decide to make an arrest. The weight and pertinence of any communications regarding the officer's degree of suspicion will depend upon the facts and circumstances of the particular case.

Id. (emphasis supplied). This entire line of precedent demonstrates "that a determination of whether the situation [i]s custodial for Miranda purposes will often require a careful examination of all the [objective] circumstances of the particular case." LaFave, supra § 6.6(c), at 729.
The United States Supreme Court has also held that "voluntary"[24] interviews conducted in police stations do not necessarily trigger Miranda. See Oregon v. Mathiason, 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) (defendant not in custody where: (1) he voluntarily traveled to the police station; (2) the interrogating officer explicitly told him that he was not under arrest; (3) the interview lasted for thirty minutes; and (4) the defendant was free to leave after the interview); California v. Beheler, 463 U.S. 1121, 1123-25, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (defendant not in custody where: (1) he voluntarily traveled to the police station; (2) the interrogating officer told him that he was not under arrest; and (3) the interview lasted for thirty minutes); see also Roman v. State, 475 So.2d 1228, 1230-32 (Fla.1985) (defendant not in custody where: (1) he voluntarily traveled to the police station; (2) the police did not confront him with evidence of his guilt but, instead, showed him photographs of the child victim and pleaded that he help ensure the child's proper burial; and (3) the interview lasted for 3.5 hours). Of course, this raises at least two questions: (1) What qualifies as a "voluntary" interview?; and (2) Once an interview is classified as "voluntary," does it inexorably remain so?
Similar to the traffic-stop situation at issue in Berkemer, at some point the words and conduct of the interrogating officers may transform that which once was a noncustodial, "voluntary" event into a custodial interrogation, which then triggers Miranda. See, e.g., Mansfield v. State, 758 So.2d 636, 644 (Fla.2000) (the interrogating detectives converted a "voluntary" interview into a custodial interrogation where: "[1] [the defendant] was interrogated by three detectives at the police station, [2] he was never told he was free to leave, [3] he was confronted with evidence strongly suggesting his guilt, and [4] he was asked questions that made it readily apparent that the detectives considered him the prime, if not the only, suspect"); Caso v. State, 524 So.2d 422, 424 (Fla.1988) (finding the defendant "in custody" and stating, "Contrary to the defendants in Beheler and Mathiason, Caso did not initiate the contact with police. Moreover, Caso was interrogated at the police station and was not specifically informed that he was not under arrest, despite being confronted with evidence which implicated him in the crime. . . .").
Thus, the statements that appear in Mathiason and Beheler indicating that the "the requirement of warnings [is not] to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the *245 police suspect,"[25] must be interpreted in light of the objective circumstances presented in those cases, as disclosed by the words and actions of the interrogating officers. In each case, the defendants were explicitly told that they were not under arrest, the interviews only lasted for thirty minutes, and the defendants were free to leave post-interview. Further, Mathiason is now of dubious validity to the extent the Court held that confrontation with evidence of guilt does not bear on custody determinations. Mathiason appears to have employed a now abandoned subjective test to hold that the officer's false claim that the defendant's fingerprints matched those recovered from the scene of a burglary was of no significance. See LaFave, supra § 6.6(d), at 734 n. 49 ("[T]he [holding of the] Court in Mathiason, by stating the officer's falsehood `has nothing to do with whether respondent was in custody for purposes of the Miranda rule,' . . . cannot be squared with the Court's [modern] objective test, [therefore] it is often not followed by lower courts. See, e.g., . . . Mansfield v. State, 758 So.2d 636 (Fla.2000) (custody [occurred] at station where defendant `was confronted with evidence strongly suggesting his guilt, and he was asked questions that made it readily apparent that the detectives considered him the prime, if not the only, suspect'). . . .").
The High Court most recently reaffirmed its objective "reasonable person" Miranda custody test in a federal habeas case, which required a deferential standard of review under the Antiterrorism and Effective Death Penalty Act of 1996. See Yarborough v. Alvarado, 541 U.S. 652, 655, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004) ("[A] federal court can grant an application for a writ of habeas corpus on behalf of a person held pursuant to a state-court judgment if the state-court adjudication `resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.'" (quoting 28 U.S.C. § 2254(d)(1)) (emphasis supplied)).
Under the applicable deferential standard of review, the High Court reversed the Ninth Circuit Court of Appeals and upheld a state-court determination that the defendant was not in custody where: (1) the seventeen-nearly eighteen-year-old, defendant voluntarily came to a sheriff's station accompanied by his parents for an interview concerning a murder investigation; (2) the recorded interview took place in a small room; (3) the parents waited in the lobby; (4) the interview lasted for two hours; (5) a single interrogating detective questioned the defendant and asked him on at least two occasions whether he needed a break; (6) the detective questioned the defendant in a nonconfrontational, nonthreatening manner; and (7) the defendant returned home after the interview. Alvarado, 541 U.S. at 655-58, 664-65, 124 S.Ct. 2140; cf. Schoenwetter v. State, 931 So.2d 857, 868 (Fla.2006) (teenage murder suspect not in custody where police confronted him with evidence of his guilt before he agreed to a voluntary interview). By recognizing that it was bound by a deferential standard of review, and that this was a close case over which "fair-minded jurists could disagree," the Alvarado Court did not offer much guidance as to whether it would have upheld the custody determination under de novo review. However, the High Court did reemphasize the following objective reasonable-person *246 framework, which it originally articulated in Thompson v. Keohane, 516 U.S. 99, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995):

Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave. Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry: was there a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.
Alvarado, 541 U.S. at 663, 124 S.Ct. 2140 (emphasis supplied) (quoting Thompson, 516 U.S. at 112, 116 S.Ct. 457). This Court has adopted the same objective, reasonable-person framework. See Connor v. State, 803 So.2d 598, 606 (Fla.2001) (quoting the Thompson standard with approval). However, we have also adopted a subsidiary four-part channeling paradigm to organize and analyze the case-specific facts that are relevant to determining whether a reasonable person would have felt that he or she was not at liberty to terminate the interrogation and leave. See Ramirez v. State, 739 So.2d 568 (Fla.1999) (adopting the four-part test enunciated by the Iowa Supreme Court in State v. Countryman, 572 N.W.2d 553, 558 (Iowa 1997)). This four-part test requires the Court to consider:
(1) the manner in which police summon the suspect for questioning;
(2) the purpose, place, and manner of the interrogation;
(3) the extent to which the suspect is confronted with evidence of his or her guilt; [and]
(4) whether the suspect is informed that he or she is free to leave the place of questioning.
Ramirez, 739 So.2d at 574. Hence, Miranda custody determinations present mixed questions of law and fact, under which the reviewing court defers to the competent factual determinations of the trial court but analyzes de novo the application of the law to those facts. See, e.g., Connor, 803 So.2d at 605-07. In this context, precedent remains a persistent guide but often plays less of a role because each custody determination depends upon the highly unique facts of the given case:
Suppression issues are extraordinarily rich in diversity and run the gamut from (1) pure questions of fact, to (2) mixed questions of law and fact, to (3) pure questions of law. Reviewing courts must exercise care when examining such issues, for while the issues themselves may be posed in broad legal terms . . ., the actual ruling is often discrete and factual (e.g., whether police did in fact tell a suspect he was free to go, whether police did in fact ask a suspect if he committed the crime).
State v. Glatzmayer, 789 So.2d 297, 301 (Fla.2001) (footnotes omitted).

B. The Miranda Issues Involved in this Case

i. Was Rigterink "in Custody" for Miranda Purposes?
We acknowledge that we must defer to the factual determinations of the trial court if those findings are supported by competent, substantial evidence from the record. See, e.g., Connor, 803 So.2d at 607-08. In contrast, we review de novo the application of the law to those facts. See id. at 608. Before trial, Rigterink moved to suppress only the videotaped portion of his police interrogation. During the suppression hearing, PCSO Detective *247 Jerry Connolly testified on behalf of the State, and the defense presented a partial transcript of Rigterink's confession (to verify the defective right-to-counsel warning that Rigterink received) and a copy of the defective PCSO rights-warning card.[26] Detective Connolly's testimony included the following relevant facts:
 PCSO detectives previously interviewed Rigterink at his home on September 25, 2003, and October 9, 2003. At those interviews, Rigterink admitted that he had set up a marijuana buy over the phone with victim Jarvis on Wednesday, September 24, 2003 (the day of the murders), but claimed that the buy was scheduled for a different day (Friday, September 26, 2003);
 Rigterink agreed to visit the PCSO on October 10, 2003, to provide "elimination prints," but failed to show up for the appointment;
 Rigterink eventually called and rescheduled for October 13, 2003, but he also failed to show up for that appointment;
 Plainclothes PCSO detectives, including Detective Connolly, were finally able to reestablish contact with Rigterink at his parents' home on the morning of October 16, 2003;
 Rigterink voluntarily agreed to provide "elimination prints," and as he was getting dressed, he spontaneously stated that two methamphetamine dealers from Lake Wales may have murdered the victims;
 Rigterink was never restrained, and his parents voluntarily drove him to the PCSO's BCI office for fingerprinting;
 Detective Connolly requested that Rigterink's parents remain in the lobby during the interview process, but it is unclear whether Rigterink was aware of this arrangement;
 PCSO latent-fingerprint analyst Patricia Newton and her supervisor, Bill Thomas, were present and fingerprinted Rigterink before his interview. The detectives prearranged for the analysts to compare Rigterink's fingerprints with the bloody crime-scene latents during their interview of Rigterink;
 Rigterink's interview began at 11:00 a.m. on October 16. The detectives questioned him in a six-by-eight foot polygraph-examination room, which was sound-insulated with protective foam. The room contained three chairs and a small desk;
 At least two detectives were in the room at all times, and other detectives which included Detective Raczynski, Detective Scott Rench, and Major Martinentered and exited the room during the questioning process;
 The door was closed, but not locked, while the interview or interrogation took place (however, it is unclear how this detail holds any significance because there was no testimony that Rigterink was aware whether the door was locked or unlocked);
 The detectives and Rigterink discussed his previous descriptions of his whereabouts and actions on September 24, 2003 (i.e., the day of the murders). They began by discussing Rigterink's use of his father's Toyota pickup. Once they established this fact, the detectives moved to discussing Rigterink's relationship with Jarvis beginning with September 21 or *248 22, 2003, which were the dates on which Rigterink believed that he first borrowed his father's pickup;
 Rigterink readily admitted that on September 22, 2003 (two days before the murders), he purchased marijuana at Jarvis's home;
 Rigterink provided his first story, which was that he was never at Jarvis' residence on the day of the murders;
 The detectives stated that they did not believe this story, and Rigterink presented his second story, which was (1) that he went to Jarvis's home on the day of the murders to purchase marijuana, and (2) that Jarvis was unharmed when he left at approximately 2:30 or 3 p.m.;
 Sometime during the questioning process, Detective Connolly received a message from the fingerprint analysts, which stated that Rigterink's prints matched the bloody latents recovered from the crime scene;
 After Rigterink completed his second story, the detectives confronted him with the fact that his prints matched the bloody latents discovered at the crime scene;
 Rigterink then presented his third story, which was that he visited Jarvis' home on the day of the murders but arrived after the deaths occurred and left before the police arrived;
 After Rigterink completed his third story, the detectives again accused him of dissembling, and he then responded that he would tell them "the whole truth";
 The detectives then advised Rigterink of his Miranda rights, and Detective Connolly briefly stepped out of the room to request that a technician turn on the interrogation room's hidden video-recording equipment;
 The initial, untaped portion of the interrogation lasted three hours and twenty-four minutes (i.e., from 11:00 a.m. until 2:24 p.m.) before Detective Connolly decided to Mirandize Rigterink and videotape his statements;
 Detective Connolly testified that he Mirandized Rigterink to ensure the admissibility of his confession, and that Rigterink and Connolly signed the rights-waiver form in each other's presence after Connolly read Rigterink his rights. Connolly had no idea that the rights-waiver form was deficient with regard to its description of the right to counsel;
 Rigterink then "confessed," but couched his confession in terms of a series of "Polaroid snapshots," and claimed that he could not actually remember stabbing either of the victims (although he did admit that he physically struggled with Jarvis);
 Rigterink never asserted his right to remain silent, his right to terminate questioning, or his right to speak with an attorney "prior to questioning";
 During the "confession," Rigterink physically demonstrated his movements and actions vis-à-vis the victims and drew an accompanying diagram (State's exhibit 466);
 After Rigterink "confessed," Detective Connolly called an assistant state attorney to ensure that he had probable cause to arrest Rigterink. The ASA agreed that Detective Connolly had probable cause, and the detectives arrested Rigterink in the office and officially placed him in PCSO custody. The arrest occurred at approximately 5:30 p.m. (6.5 hours after the interrogation began);
 Rigterink was 32 years old at the time of questioning, had completed college course work, and was "alert and *249 awake and very energetic" during the taped portion of the interrogation;
 Until his arrest, Rigterink was not placed in handcuffs or otherwise restrained, but the detectives never told him that he was free to leave;
 By the time of his October 16 interrogation, Rigterink was the primary suspect in the Jarvis-Sousa murders, but Detective Connolly did not provide any indication that PCSO personnel informed Rigterink of this status.
Based on these facts, the trial court denied Rigterink's suppression motion. While the trial court's order included a minor reference to the irrelevant, undisclosed subjective intent of the PCSO detectives,[27] it generally provided a good overview of the relevant facts. In support of its order, the trial court relied upon Cillo v. State, 849 So.2d 353 (Fla. 2d DCA 2003), which held that a defendant was not in custody under this Court's four-part Ramirez test where: (1) the defendant voluntarily agreed to accompany two Sarasota County Sheriff's deputies to a sheriff's office for an interview (similar to Rigterink); (2) the entire interview was videotaped and took place in a small interview room (similar to Rigterink save for the fact that only a portion of Rigterink's interrogation was taped); (3) "The atmosphere of the interview was conversational, and no threats or promises were made" (similar to Rigterink in that no threats or promises were made); and (4) the detectives informed the defendant of the victim's allegations against him, but did not confront him with physical evidence of his guilt (different from Rigterink); and (5) the detectives informed the defendant "that he was not under arrest and that he could leave at any time" (different from Rigterink). Id. at 355-57 (emphasis supplied). The trial court did not explain how these factual variations might have impacted its custody determination, if at all.
The facts established during the suppression hearing, which the trial court adequately summarized in its order, have thus "set the scene" of inquiry. See Alvarado, 541 U.S. at 663, 124 S.Ct. 2140. Given these factual circumstances, the second step of the custody analysis is to determine whether "a reasonable person [would] have felt [that] he or she was not at liberty to terminate the interrogation and leave." Alvarado, 541 U.S. at 663, 124 S.Ct. 2140 (quoting Thompson, 516 U.S. at 112, 116 S.Ct. 457). As stated above, Ramirez provides the following question-based channeling mechanism to answer this question:
(1) the manner in which police summon the suspect for questioning;
(2) the purpose, place, and manner of the interrogation;
(3) the extent to which the suspect is confronted with evidence of his or her guilt; [and]
(4) whether the suspect is informed that he or she is free to leave the place of questioning.
739 So.2d at 574 (citing Countryman, 572 N.W.2d at 558) (formatting altered). Similar to many other Fourth and Fifth Amendment inquiries, no individual factor is singularly determinative;[28] rather, the "totality of circumstances" controls, and *250 the dispositive inquiry remains whether "a reasonable person placed in the same position would believe that his or her freedom of action was curtailed to a degree associated with actual arrest." Ramirez, 739 So.2d at 573. With this standard in mind, we apply the four Ramirez factors to the competent, substantial evidence contained within the record.

a. Rigterink Voluntarily Appeared for Fingerprinting and Questioning
The first Ramirez factor addresses the manner in which law enforcement summoned the defendant for questioning and what objective impetus caused the defendant to attend. See 739 So.2d at 574. Here, Rigterink voluntarily traveled with his parents to the BCI office to provide "elimination prints" and to speak with PCSO detectives concerning his activities and whereabouts on the day of the murders. Rigterink was not arrested and was not restrained for purposes of officer safety. Moreover, he rode with his parents to the BCI office. This factor militates in favor of the conclusion that Rigterink was not in custody for purposes of Miranda.

b. Rigterink was Questioned in a Small Interrogation Room for Several Hours by a Group of Detectives who Repeatedly Accused him of Lying Concerning His Activities and Whereabouts on the Day of the Murders
The second Ramirez factor is "the purpose, place, and manner of the interrogation." 739 So.2d at 574. This factor "is, of course, a multifaceted factor which encompasses the circumstances . . . in which the interrogation is conducted." State v. Pitts, 936 So.2d 1111, 1126 (Fla. 2d DCA 2006). The detectives' purpose for requesting that Rigterink accompany them to the BCI was two-fold: (1) to secure his "elimination prints"; and (2) to speak with him regarding his activities and whereabouts on the day of the murders. The questioning was conducted in a small, sound-insulated polygraph room, where a group of at least four investigators rotated in and out of the room to question Rigterink (Detectives Connolly, Raczynski, Rench, and Major Martin). At least two detectives were with Rigterink at all times. The six-by-eight foot room contained three chairs and a small desk. In total, the interrogation continued for at least four hours and for perhaps as much as 6.5 hours (there was no specific testimony with regard to how much time elapsed between the close of questioning and when Rigterink was arrested at 5:30 p.m.). The first 3.5 hours of questioning were not recorded. It is clear that Detective Connolly only turned on the recording device after he was certain that Rigterink would inculpate himself. Importantly, the detectives repeatedly accused Rigterink of lying with the goal of obtaining a factual summary that explained the evidence and explained the crime scene and explained Rigterink's actions as far as his unusual behavior. That is the information law enforcement was seeking.
While the questioning of a suspect within the confines of a police station does not necessarily convert a voluntary interview into custodial interrogation,[29] the manner in which these detectives conducted Rigterink's questioningwhich included repeated accusations and confrontations over several hours that he was lying and was somehow involved in these murders *251 (including confrontation with inculpatory evidence)militates in favor of the conclusion that a reasonable person in Rigterink's position would not have believed that he or she was free to leave the BCI office or to terminate questioning. Many Florida decisions that have determined the defendant was not in custody have emphasized that the interviewing detectives did not directly contradict the defendant's story or accuse the defendant of lying. See, e.g., Meredith v. State, 964 So.2d 247, 251 (Fla. 4th DCA 2007) (citing Stansbury v. California, 511 U.S. 318, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994); Pitts, 936 So.2d at 1128). This is not such a case.
Furthermore, while lower-court case law has recently focused on the absence of force during "voluntary" police interviews,[30]Miranda itself deemphasized the importance of this consideration:
Again we stress that the modern practice of in-custody interrogation is psychologically rather than physically oriented. As we have stated before, "Since Chambers v. Florida, 309 U.S. 227[, 60 S.Ct. 472, 84 L.Ed. 716], this Court has recognized that coercion can be mental as well as physical, and that the blood of the accused is not the only hallmark of an unconstitutional inquisition." Blackburn v. Alabama, 361 U.S. 199, 206[, 80 S.Ct. 274, 4 L.Ed.2d 242] (1960). Interrogation still takes place in privacy. Privacy results in secrecy and this in turn results in a gap in our knowledge as to what in fact goes on in the interrogation rooms.
Miranda, 384 U.S. at 448, 86 S.Ct. 1602 (emphasis supplied). Thus, this renewed focus on the lack of physical compulsion or force is overemphasized, and actually overlooks one of the central premises of Mirandaofficial compulsion is often psychological, not physical. Hopefully, our civilized society has progressed far beyond the use of physical mistreatment in connection with the investigative endeavors of law enforcement.
The presence of force would certainly indicate custody, but its absence does not necessarilyor even oftenindicate that a reasonable person would feel free to simply get up and leave the interview room. See, e.g., Mansfield v. State, 758 So.2d 636, 644 (Fla.2000); Caso v. State, 524 So.2d 422, 424 (Fla.1988) (each decision held that the defendant was in custody without ever mentioning or analyzing the absence of physical force). Further, we doubt that the State would ever contend that a suspect was not in custody if a law-enforcement officer physically compelled the suspect's incriminating statements (not to mention that this would raise traditional Fifth Amendment voluntariness concerns even if Miranda had never been decided).
In sum, "the purpose, place, and manner" of Rigterink's interrogation indicate that a reasonable person would not have felt that he or she was free to simply terminate questioning and leave the premises. A four-plus-hour-long interview or interrogation, which included repeated accusations of lying and dissembling, and confrontation with incriminating evidence, all of which took place in a small sound-insulated interview room, with a closed door, in the presence of at least two interrogating detectives, is not conducive to a finding that the defendant was free to terminate the questioning process and leave the station house or that a "reasonable *252 person" would have felt free to simply walk out.

c. Rigterink was Confronted with Evidence "Strongly Suggesting" his Guiltthe Bloody Latent Fingerprints Recovered from the Crime Scene
While not singularly dispositive, this is one of, if not the, weightiest Ramirez factor. See Pitts, 936 So.2d at 1127-28. Similar to Mansfield, in which we held that the defendant was in custody, Rigterink was "interrogated by [several] detectives at the police station, he was never told he was free to leave, he was confronted with evidence strongly suggesting his guilt, and he was asked questions that made it readily apparent that the detectives considered him the prime, if not the only, suspect." 758 So.2d at 644. As the Second District observed in Pitts:
A reasonable person understands that the police ordinarily will not set free a suspect when there is evidence "strongly suggesting" that the person is guilty of a serious crime. That does not mean that whenever a suspect is confronted with some incriminating evidence, the suspect is in custody for purposes of Miranda. The significance of this factor turns on the strength of the evidence as understood by a reasonable person in the suspect's position as well as the nature of the offense. If a reasonable person in the suspect's position would understand that the police have probable cause to arrest the suspect for a serious crime such as murder or kidnapping, that circumstance militates strongly toward the conclusion that the suspect is in custody. [However,] [i]f the suspect has been advised that he is not under arrest and is free to leave, the significance of this circumstance, of course, would be diminished.
936 So.2d at 1128 & n. 8 (emphasis supplied) (footnotes and internal division omitted).
Other than a murder weapon or DNA evidence tying the killer to the victims, it is difficult to imagine a more incriminating evidentiary item than one's bloody fingerprints being discovered at the scene of the murders. Along with, and in consideration of, all other factors, a reasonable person in Rigterink's position certainly would not have felt free to leave police custody once the detectives disclosed this fingerprint match. Unlike the "potentially self-serving accusation[s]" of cosuspects or codefendants involved in cases such as Pitts, this fingerprint match was very strong physical, albeit circumstantial, evidence of Rigterink's guilt.

d. Rigterink Was Not Informed That He Was Free to Leave
The fourth and final Ramirez factor is whether the questioning detectives informed the defendant that he or she was not under arrest and was free to leave. See 739 So.2d at 574. During the suppression hearing, Detective Connolly conceded that neither he nor any of the other detectives informed Rigterink that he was not under arrest and was free to leave. In response, the State conversely stresses that none of the detectives told Rigterink that he was under arrest or that he had to remain; however, in Ramirez, we were not concerned with this rephrased inquiry. But see Pitts, 936 So.2d at 1124-25 (engaging in just such a rephrased, converse inquiry). The relevant question is "whether the suspect [wa]s informed that he or she [wa]s free to leave the place of questioning," not whether the defendant was informed that he or she was required to remain. Ramirez, 739 So.2d at 574. The manner in which we framed the inquiry in Ramirez makes abundant sense because Miranda presumes that incommunicado *253 station-house questioning inherently entails some level of compulsion, which the interrogating officers are always free to dispel by informing or reminding the defendant that the interview is strictly voluntary and that the defendant remains free to terminate questioning and leave the premises.
Decisions from the district courts of appeal are replete with examples of conscientious officers reminding the defendant of the voluntary nature of the interview and his or her ability to leave. See, e.g., Meredith, 964 So.2d at 249, 252 (defendant informed that he was not under arrest and that the interview was "strictly voluntary"); State v. Rodriguez, 785 So.2d 759, 760-61 (Fla. 3d DCA 2001) (defendant informed that "he was free to leave at any time"). None of the detectives so informed Rigterink. If an interview is truly "voluntary," then it is difficult to understand why any interviewing detective would not undertake this simple expedient, which largely avoids the risk of rendering any unwarned statements inadmissible under Miranda. This is so because a reviewing court is far less likely to find that a reasonable person would have believed that he or she was in custody if the police specifically informed him or her that the interview was strictly voluntary and that he or she wasand continually remainedfree to leave at any time. See Pitts, 936 So.2d at 1128 n. 8. Here, while not singularly dispositive, this factor militates in favor of finding that Rigterink was in custody for Miranda purposes. See Roman, 475 So.2d at 1231.

e. Conclusion: Rigterink was in Custody for Miranda Purposes
Based on the "totality of circumstances," we hold that Rigterink was in custody immediately prior to and during his videotaped interrogation. Our custody determination correspondingly triggers the requirement that Rigterink have received constitutionally sufficient Miranda warnings. See, e.g., State v. Powell, 998 So.2d 531, 534 (Fla. 2008) ("To ensure compliance with the privilege against self-incrimination, the United States Supreme Court outlined in Miranda . . . four procedural safeguards that must be employed to protect the privilege when an individual has been deprived of freedom during a custodial interrogation." (emphasis supplied)).

ii. Rigterink's Right-to-Counsel Warning was Defective Because it Stated that He Only Had a "Right to Have an Attorney Present Prior to Questioning"
We recently addressed a similar issue in Powell, where we held:
The [Miranda] Court unequivocally said that "an individual held for interrogation must be clearly informed that he has the right to consult with a lawyer and to have the lawyer with him during interrogation." [Thus,] the right "to talk to a lawyer before answering any. . . questions" constitutes a narrower and less functional warning than that required by Miranda. Both Miranda and article I, section 9 of the Florida Constitution require that a suspect be clearly informed of the right to have a lawyer present during questioning.
998 So.2d at 533-534 (emphasis supplied) (quoting Miranda, 384 U.S. at 471, 86 S.Ct. 1602). While Miranda warnings need not be a "virtual incantation of the precise language contained in the Miranda opinion," California v. Prysock, 453 U.S. 355, 355, 101 S.Ct. 2806, 69 L.Ed.2d 696 (1981), they must reasonably convey the quintessential essence of the rights described by the United States Supreme Court, which unequivocally includes the right to "the presence" of an attorney "during [not merely prior to, before, or *254 after] interrogation." Miranda, 384 U.S. at 444, 466, 470, 479, 86 S.Ct. 1602 (emphasis supplied); see also, e.g., Prysock, 453 U.S. at 361, 101 S.Ct. 2806 ("It is clear that the police in this case fully conveyed to respondent his rights as required by Miranda. He was told of his right to have a lawyer present prior to and during interrogation, and his right to have a lawyer appointed at no cost if he could not afford one." (emphasis supplied)). We steadfastly adhere to our conviction that the law-enforcement personnel of this state are more than capable of administering Miranda warnings that accurately reflect the law, and further, the vast majority of Florida's law-enforcement agencies already possess and provide adequate warnings. This pervasive use of Miranda warnings that fully inform a person of his or her right to an attorney prior to and during questioning confirms that our holding in Powell does not unnecessarily burden the proper investigation of crime. Rather, providing an adequate rights warning constitutes a minimal obligation of law enforcement, which guarantees that the purposes of Miranda are satisfied and that the relevant rights under the federal Fifth Amendment and article I, section 9 of the Florida Constitution are satisfactorily communicated. As the United States Supreme Court has observed, Miranda and its rights-warning list have "become embedded in routine police practice to the point where the warnings have become part of our national culture." Dickerson v. United States, 530 U.S. 428, 443, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000). This firmly established aspect of American legal and popular culture is thus particularly ill-suited to undue experimentation concerning the essential nature of the conferred and communicated rights.
Here, in comparison to Powell, the PCSO detectives provided Rigterink with a similarly defective right-to-counsel warning both verbally and in writing. Specifically, the relevant portion of the warning stated that Rigterink had "the right to have an attorney present prior to questioning." (Emphasis supplied.) Therefore, Powell directly controls this issue. The right-to-counsel warning was materially deficient because it did not accurately and clearly convey one of the central components of Miranda: The custodial subject enjoys a right to the presence of counsel during, not merely before, a custodial interrogation. See Prysock, 453 U.S. at 361, 101 S.Ct. 2806; Miranda, 384 U.S. at 444, 466, 470, 479, 86 S.Ct. 1602; Powell, 998 So.2d at 540-541. As we held nearly seventeen years ago under our state Constitution:
[T]o ensure the voluntariness of confessions, the Self-Incrimination Clause of Article I, Section 9, Florida Constitution, requires that prior to custodial interrogation in Florida suspects must be told that they have a right to remain silent, that anything they say will be used against them in court, that they have a right to a lawyer's help, and that if they cannot pay for a lawyer one will be appoint to them. This means that the suspect has the right to consult with a lawyer before being interrogated and to have the lawyer present during interrogation.
Traylor v. State, 596 So.2d 957, 965-66 & n. 13 (Fla.1992) (emphasis supplied).

iii. The Admission of the Taped Portion of Rigterink's Interrogation Constituted Harmful Error
Despite our holdings above that (i) Rigterink was in custody during the videotaped portion of his interrogation and (ii) the right-to-counsel warning was materially deficient, the erroneous admission of the videotaped confession during Rigterink's trial remains subject to harmless-error review. *255 See, e.g., Mansfield, 758 So.2d at 644 ("The erroneous admission of statements obtained in violation of Miranda rights is subject to harmless error analysis." (quoting Caso, 524 So.2d at 425)); Alvord v. Dugger, 541 So.2d 598, 600-01 (Fla.1989) (substantially similar). To affirm a conviction despite error at trial, the State must prove beyond a reasonable doubt that the error "did not contribute to the verdict or, alternatively stated, that there is no reasonable possibility that the error contributed to the conviction." State v. DiGuilio, 491 So.2d 1129, 1135 (Fla. 1986).
In this case, we conclude that the admission and presentation of the videotaped portion of Rigterink's interrogation during his capital trial was harmful error. Although each of the three prior inconsistent stories that Rigterink provided would remain admissible to demonstrate his complete dishonesty, and despite the fact that there is circumstantial evidence demonstrating that he committed these murders, we cannot say that the erroneously admitted videotape did not "contribute to"[31] his convictions. There is evidence that on October 15, 2003, pursuant to the written consent of Rigterink's father, PCSO CSTs searched his father's 1992 blue Toyota pickupwhich Rigterink had previously admitted that he was driving on the day of the murders. Inside the truck, the CSTs discovered large amounts of victim Jarvis's blood. Relatedly, Rigterink could not be excluded as the donor of the foreign organic material discovered under Jarvis's fingernails. During the period when PCSO investigators were attempting to eliminate Jarvis's known associates as suspects, Rigterink barricaded himself inside his home, concealed himself on his parents' roof for at least two days, and repeatedly failed to show up for scheduled fingerprint-examination appointments. The male and female eyewitnesses provided descriptions that were consistent with Rigterink's appearance and physical characteristics on the day of the murders. The female eyewitness also identified Rigterink from a PCSO photograph spread as the suspect who most resembled the attacker. Two to three days following the murders, Rigterink visited his barber for a "drastically" different haircut. Rigterink's ex-wife testified that he always kept a black military knife with a ten-to-eleven-inch blade lodged between their mattress and box spring. Despite repeated searches, PCSO investigators were never able to locate this knife. During the guilt and penalty phases, the medical examiners testified that the victims' stab wounds, cuts, and abrasions were consistent with injuries caused by just such a weapon. Rigterink could never provide a verifiable alibi. The State provided clear evidence of Rigterink's motive: he was addicted to drugs, but lacked the funds necessary to feed his addiction, so he attempted to rob Jarvis, his dealer, but ended up killing him along with an innocent bystander. Finally, Rigterink's fingerprints were discovered in blood at the crime scene on the inside portion of Jarvis's front door. In addition, a fingerprint analyst testified that these bloody prints were consistent with the print donor's fingers having already been covered in blood and the donor then touching the door, rather than the surface of the door having blood on it with the print donor merely touching the freshly deposited blood.
In sum, the evidence suggests that Rigterink has entangled himself in a web of deceit and these circumstances may indicate guilt. However, our harmless-error test is not guided by a sufficiency-of-the-evidence, correct-result, not-clearly-wrong, *256 substantial-evidence, more-probable-than-not, clear-and-convincing, or overwhelming-evidence test. See DiGuilio, 491 So.2d at 1139. If any of these were the proper test, we might agree that the admission and publication of Rigterink's videotaped interrogation constituted harmless error. The simple answer to the simple question of whether there is competent, substantial evidence to support the charges that Rigterink committed these crimes is "Yes." However, the actual question that we must askand the constitutional protection that we must address are not so simple. We have specifically rejected sufficiency-of-the-evidence approaches through our decision in DiGuilio, and we will not recede from established precedent by, on the one hand, paying lip service to its requirements and then, on the other, employing reasoning that would be clearly contrary to the pertinent legal standard. See id. Here the videotaped portion of Rigterink's October 16, 2003, interrogation was not just evidence, it was utilized as the centerpiece of the State's opening statement, case-in-chief, and closing argument. Further, the very last evidentiary item that the jury specifically requested and considered as it conducted its deliberations was this same videotaped statement.
Under a proper analysis, we conclude that the jury most assuredly, and very seriously, considered and substantially included Rigterink's videotaped interrogation in reaching its verdicts. Therefore, the erroneous publication and admission of this videotape during Rigterink's capital trial "contributed to"[32] his convictions. Any other holding with regard to this issue would elicit alternating images of an ostrich with its head buried firmly in the sand or the proverbial "three wise monkeys," steadfastly refusing to see, hear, or speak of any transgression. In contrast, we reverse Rigterink's convictions and sentences and remand for a new capital trial during which this videotape is excluded. This is not because Rigterink is innocent;[33] rather, it is because the rules established to guard fundamental constitutional protections were not followed, and, under these facts, we cannot say that the videotapewhich should have been suppressed based upon proper legal analysisdid not "contribute to" his convictions. The murders committed in this case were horrific, gruesome, and worthy of condemnation; moreover, there is evidence to support the verdicts returned by the jury. However, the rule of law must prevail and we must not allow the ends of punishment to trump the means that our state and federal Constitutions require.

The DiGuilio Standard
The now firmly established standards that we articulated in DiGuilio many years ago control the resolution of whether the publication and admission of Rigterink's videotaped interrogation constituted harmless error. In that decision, we stated:
The harmless error test . . . places the burden on the state, as the beneficiary of the error, to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict or, alternatively stated, that there is no reasonable possibility that the error contributed to the conviction. Application of the test requires an examination of the entire record by the appellate court including a close examination of the permissible evidence on which the jury could have legitimately relied, and in addition an *257 even closer examination of the impermissible evidence which might have possibly influenced the jury verdict.
. . . .
. . . [H]armless error analysis must not become a device whereby the appellate court substitutes itself for the jury, examines the permissible evidence, excludes the impermissible evidence, and determines that the evidence of guilt is sufficient or even overwhelming based on the permissible evidence. In a pertinent passage [which we endorsed and adopted], Chief Justice Traynor [of the California Supreme Court] points out:
Overwhelming evidence of guilt does not negate the fact that an error that constituted a substantial part of the prosecution's case may have played a substantial part in the jury's deliberation and thus contributed to the actual verdict reached, for the jury may have reached its verdict because of the error without considering other reasons untainted by error that would have supported the same result.
. . . .
. . . The test must be conscientiously applied and the reasoning of the court set forth for the guidance of all concerned and for the benefit of further appellate review. The test is not a sufficiency-of-the-evidence, a correct result, a not clearly wrong, a substantial evidence, a more probable than not, a clear and convincing, or even an overwhelming evidence test. Harmless error is not a device for the appellate court to substitute itself for the trier-of-fact by simply weighing the evidence. The focus is on the effect of the error on the trier-of-fact. The question is whether there is a reasonable possibility that the error affected the verdict. The burden to show the error was harmless must remain on the state. If the appellate court cannot say beyond a reasonable doubt that the error did not affect the verdict, then the error is by definition harmful.

DiGuilio, 491 So.2d at 1135-39 (citations omitted) (emphasis supplied) (quoting People v. Ross, 67 Cal.2d 64, 60 Cal.Rptr. 254, 429 P.2d 606, 621 (1967) (Traynor, C.J., dissenting), rev'd, 391 U.S. 470, 88 S.Ct. 1850, 20 L.Ed.2d 750 (1968)).
We are not nor do we consider ourselves a super-jury; rather, we are an appellate tribunal charged with the task of determining "whether there is a reasonable possibility that the error affected the verdict." Id. at 1139 (emphasis supplied). If such a possibility exists, it is our duty to remand for a new trial, which shall be free from the offending error. The test is not whether the jury reached what we believe to be the correct result but is, instead, whether a reasonable possibility exists that the constitutional violation contributed to the defendant's convictions. See id. at 1135-36, 1139.
Where, as here, the State makes a defendant's inculpatory videotaped statement a fixture of its opening statement, case-in-chief, and closing argument, and, thereafter, where the jury specifically requests to review this tape yet again during its deliberations just before rendering its verdicts, we cannot say "beyond a reasonable doubt that the error . . . did not contribute to the verdict or, alternatively stated, that there is no reasonable possibility that the error contributed to the conviction." Id. at 1135.

DiGuilio Applied to This Case
The harmless-error standard that we provided in DiGuilio has been clearly stated. When applied here, it is apparent that in reaching its verdicts, the jury extensively considered Rigterink's erroneously admitted videotaped interrogation. This is so because during each stage of Rigterink's capital trial, the State presented this *258 videotape as the centerpiece of its case against the defendant. In fact, this recording was the primary device that the State used to coordinate and describe how the physical evidence and testimony in this case established Rigterink's guilt beyond a reasonable doubt. The State's opening statement, case-in-chief, and closing argument each depended upon the explanatory power of Rigterink's videotaped interrogation. Therefore, it cannot be defensibly maintained that the publication and admission of this videotape constituted harmless error. Such a holding would require speculative logical leaps and force this Court to simply consider itself a super-jury, which somehow possesses the power to tidily divide and segregate erroneously admitted, prejudicial evidence from admissible, probative evidence to declare with finality what the correct verdict(s) should be. Under the circumstances presented here, we cannot depart from well-established, controlling precedent.
To provide a more complete overview of just how the State used this videotape, brief excerpts from (and explanations of) the State's opening statement, case-in-chief, and closing argument are informative. First, during its opening statement, the State repeatedly emphasized the significance of Rigterink's videotaped interrogation and pleaded that the jury
listen very carefully to what is said in that videotaped statement. The [State] ask[s] you to watch [Rigterink's] demeanor, to watch his manner during the statements he makes in that video, because that video recording will show that [the] Detectives . . . [allowed] him to tell his story. Rigterink even volunteers to make a drawing for the detectives. . . .
He relates facts to the two detectives, facts that no one could possibly know except for the killer himself. . . . And those statements will be verified by the testimony of [other witnesses] and the physical evidence at the scene. There was only one killer, and that was [Rigterink], just like he told them on the 16th. . . .
. . . .
These are facts that only the killer would know.
. . . .
The evidence would show [that] nobody would know that detail and nobody would know those facts unless it was the killer who actually committed [these offenses].
. . . .
Rigterink, in the video, says, when I was out there with Jeremy [Jarvis], I can tell you exactly what position we were in.
. . . .
You need to listen. The State would ask you . . . to listen to this tape carefully, because these things are said, these things that only the killer would know.
Second, during its case-in-chief, the State sought admission of the videotape through Detective Connolly, and, once admitted, played the entire recording for the jury. As part of this examination, the State questioned Detective Connolly in order to demonstrate and stress the significance of Rigterink's videotaped statement. Third, during closing arguments, the State again presented Rigterink's statement as the keystone supporting its theory of the case:
[W]hen confronted with those types of questions, with that kind of pressure, that we don't believe you, you're lying to us, you're lying to us just like you did the first [few] stories, this isn't true, this isn't true, what you see[,] is what you see on the tape.
. . . .

*259 You've had an opportunity twice to listen to that tape. I invite you to listen to it again. . . .
. . . .
Watching him talk to the police, invoking the Almighty, drawing diagrams of where he was . . ., telling them that [he] had [Jarvis] up against the wall with [his] hand under [Jarvis's] throat and the knife in [his] hand, but there's no action in this still photo [Rigterink] ha[s] in [his] brain. Does that sound any more convincing to you than what he said in court? But he'll tell you that . . . was a lie.
. . . .
When you correlate that with the physical evidence, that is exactly what the officers and the crime scene investigators discovered. . . .
. . . .
He is describing what Jeremy [Jarvis] did to him. And he actually, in the video, demonstrates for the officers the manner in which Mr. Jarvis was using the [the bubblegum dispenser] to fend him off. . . .
Again, as [the State] told you in the opening statement, details that only the killer would know.
. . . .
Very accurate description of his behavior.
. . . .
Completely consistent with the physical evidence.
. . . .
Mr. Rigterink, in his statement, also talks about things that are very specific, very specific. . . . He's being very descriptive about the location of where these events took place.
Finally, to avoid the risk that the jury would somehow overlook the videotape's significance, the State allocated time during its closing argument to replay Rigterink's statement, which the State spliced with recordings of the 911 calls placed by victim Sousa and the female eyewitness to the Polk County Sheriff's Office on the day of the murders. The only reasonable conclusions to draw from this chain of events are: (1) that the State considered this videotape the central component of its case against Rigterink; and (2) that it did not wish to squander any opportunity that it had to highlight the tape's significance for the jury.
In addition, the jury's actions during its deliberations provide further insight concerning the proper resolution of this issue. Specifically, Rigterink's videotaped interrogation was the final evidentiary item that the jury specifically requested and reviewed while deliberating before it returned its guilty verdicts. Therefore, we know with uncommon certainty that the jury (quite commendably) wished to be as thorough as possible in its deliberations and, thus, heeded the State's call to review the videotape once more in determining whether Rigterink committed these murders. Soon after considering the tape, the jury emerged from its deliberations and found Rigterink guilty of both counts of first-degree murder. As a result, it cannot be gainsaid that the jury did not consider this tape in reaching its verdicts. To the contrary, we have pages of record evidence demonstrating that the State repeatedly emphasized the videotape's significance and that, in response, the jury requested to review the tape yet again before finding Rigterink guilty of two capital offenses. After "an examination of the entire record," it is simply impossible to conclude that the State has proven "beyond a reasonable doubt that the error complained of did not contribute to the [jury's] verdict[s]." DiGuilio, 491 So.2d at 1135.

*260 III. CONCLUSION
A review of the entire record reveals that the State attached great importance to this videotape and repeatedly requested that the jury consult the tape to quash any doubts that it might have with regard to Rigterink's guilt. From this same record, we also know that the jury specifically requested and considered the videotape during its deliberations. We thus possess ample evidence that the videotape affected the jury's decision to convict Rigterink. Consequently, the law requires that we reverse Rigterink's convictions and sentences and remand for a new capital trial during which this videotape is excluded. However, if, on remand, Rigterink were to take the stand and again offer a version of events that differed from that which he described during his videotaped interrogation, the State would remain free to use the videotape, and the statements contained therein, to impeach his testimony. See Oregon v. Elstad, 470 U.S. 298, 307, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985) (holding that the State may use statements obtained in violation of Miranda to impeach a defendant's trial testimony).
In sum, we are not members of a super-jury; therefore, the proper result is to reverse and remand for a new capital trial during which Rigterink may decide whether to (i) remain silent in the face of the State's case-in-chief, or (ii) take the stand and face the powerful impeachment which is sure to follow.
It is so ordered.
QUINCE, C.J., PARIENTE and LEWIS, JJ., concur.
ANSTEAD, Senior Justice, concurs in result only.
WELLS, J., dissents with an opinion.
CANADY, J., dissents with an opinion, in which WELLS, J., concurs.
POLSTON, J., did not participate.
WELLS, J., dissenting.
I join Justice Canady's dissenting opinion and believe, as I have previously written, that the majority was in error in State v. Powell, 998 So.2d 531 (Fla.2008). It is my view that this case is an example of why strict adherence to technical readings of Miranda rights forms can bring about an unreasonable and unnecessary result. Here, the tape of the police interview of Rigterink plainly shows to me that Rigterink was so intent on talking to the police officers in his effort to convince the police of his story that he paid no attention to what the Miranda warning said. Thus, language used in the warning made no difference in this case. Simply the substance of what actually happened should prevail over the form of the Miranda warning.
In addition to Justice Canady's point and my view of the effect of the form in this case, I dissent for two other reasons in respect to the defendant's confession. First, I find no error in the trial court's factual determination that in considering the totality of the circumstances, the October 16, 2003, encounter was noncustodial. The defendant came to the police substation voluntarily. Rigterink talked to the police voluntarily, and the obvious reason from the record that he did so was that the defendant believed that he could convince the police that he was not involved in the murders. The defendant was not told while he was talking to the police that he could not leave. I would find this situation analogous to the one in Fitzpatrick v. State, 900 So.2d 495, 511 (Fla.2005). The trial judge set out her findings in detail in her order denying the motion to suppress, and I would affirm her order. This Court *261 has specifically held that a trial judge's findings as to whether a suspect was in custody is clothed with a presumption of correctness. Caso v. State, 524 So.2d 422, 424 (Fla.1988). I would respect this Court's precedent.
Second, even assuming that the trial judge erred in her findings as to the defendant not being in custody and accepting Powell as the applicable law, I would find that any error was harmless beyond a reasonable doubt. We have held that Miranda violations are subject to harmless error analysis. Caso, 524 So.2d at 425; see also Eight v. State, 512 So.2d 922, 926 (Fla.1987). Here, I conclude that the other evidence in the record establishes Rigterink's guilt beyond a reasonable doubt. Among the facts proven was that just thirty minutes before the murder, Rigterink called one of the victims to confirm that the victim had a new supply of marijuana for sale. Rigterink had no money with which to purchase drugs. Two witnesses described the victim's attacker consistent with Rigterink. The victim's blood was consistent with blood found in the truck that Rigterink drove the day of the murders. DNA consistent with Rigterink's was found under the fingernails of one of the victims who was brutally attacked. Rigterink's bloody fingerprints were found at the scene. Rigterink made changes to his appearance shortly after the murders. Rigterink's explanation at trial for his fingerprints being at the scene was completely implausible.
CANADY, J., dissenting.
I dissent from the reversal of Rigterink's convictions and sentences. I agree with the majority's analysis of the issues which the majority concludes lack merit. I disagree, however, with the majority's analysis of Rigterink's Miranda[34] claim. I recognize that State v. Powell, 998 So.2d 531 (Fla. 2008), supports the conclusion that the warning given to Rigterink was defective, but I conclude that the Court should recede from this recent precedent. I would conclude that the Miranda warning given to Rigterink was not defective and that the admission of Rigterink's statement was therefore not erroneous.
In People v. Wash, 6 Cal.4th 215, 24 Cal.Rptr.2d 421, 861 P.2d 1107, 1118 (1993), the California Supreme Court considered a challenge to the sufficiency of a Miranda warning which contained the statement, "[Y]ou have the right to have an attorney present before any questioning." (Emphasis added.) The defendant contended that the warning was defective because it "failed to inform him that he was entitled to counsel during questioning." Id. (emphasis added). Rejecting this argument, the court held: "[W]e are not persuadedas defendant's argument impliesthat the language [of the warning] was so ambiguous or confusing as to lead defendant to believe that counsel would be provided before questioning, and then summarily removed once questioning began." Id. at 1118-19.
Other decisions have also upheld the validity of Miranda warnings that advise of the right of access to counsel before questioning without explicit reference to access to counsel during questioning. See United States v. Anderson, 394 F.2d 743, 746-47 (2d Cir.1968); United States v. Vanterpool, 394 F.2d 697, 699 (2d Cir. 1968); State v. Arnold, 9 Or.App. 451, 496 P.2d 919, 922-23 (1972); but see United States v. Noti, 731 F.2d 610, 614 (9th Cir.1984); Windsor v. United States, 389 F.2d 530, 533 (5th Cir.1968).
The analysis employed in Wash and similar cases is consistent with the principle *262 articulated by the Supreme Court that the proper inquiry in evaluating the sufficiency of Miranda warnings is "whether the warnings reasonably `conve[y] to [a suspect] his rights as required by Miranda.'" Duckworth v. Eagan, 492 U.S. 195, 203, 109 S.Ct. 2875, 106 L.Ed.2d 166 (1989) (alteration in original) (quoting California v. Prysock, 453 U.S. 355, 361, 101 S.Ct. 2806, 69 L.Ed.2d 696 (1981)). The warning given in this case did reasonably convey to Rigterink his right of access to counsel as required by Miranda.
In short, the words "prior to questioning" in the warning can only reasonably be understood in context as denoting the point of commencement of the right to have counsel presentnot the point of termination of that right. As the Wash court recognized, a defendant could not reasonably understand the warning as suggesting that at his request an attorney would be summoned to the scene of an impending interrogation, only to be sent away once the interrogation began. Instead, the advice that counsel is available "prior to questioning" is naturally understood as conveying the idea that no question can be asked until requested counsel is available to assist the defendant in the course of the interrogation.
Although I acknowledge that we should not recede cavalierly from our precedents, I conclude that given the serious implications of the Powell decision for the administration of justice and given the absence of any reliance interests, we should not adhere to Powell. See Payne v. Tennessee, 501 U.S. 808, 827-30, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). Accordingly, I would adopt the view of the California Supreme Court in Wash with respect to the sufficiency of the Miranda warning, reject Rigterink's claim that the warning given to him was defective, and affirm his convictions and sentences.
WELLS, J., concurs.
NOTES
[1] "Dual-use" refers to the fact that some tenants used their units for residential purposes, while others used theirs for commercial purposes.
[2] At the Spencer hearing, defense counsel presented a motion to appoint Dr. David McCraney as a psychological expert and to delay sentencing for the purpose of evaluating Rigterink through neurological and neuropsychological testing. Previously, Rigterink had undergone psychological examinations with Drs. Thomas McClane and Tracy Hartig. The trial court denied this motion because defense counsel could not provide a factual basis other than their observation that Rigterink displayed an unusual, off-putting lack of emotion during his trial. Further, the court found that defense counsel had not complied with Florida Rule of Criminal Procedure 3.202.
[3] § 921.141(5)(b), Fla. Stat. (2003).
[4] § 921.141(5)(h), Fla. Stat. (2003).
[5] § 921.141(5)(e), Fla. Stat. (2003).
[6] § 921.141(6)(a), Fla. Stat. (2003).
[7] (1) use of drugs (little weight); (2) reputation with family and friends as a peaceful person (some weight); (3) kindness and attention to maternal and paternal grandmothers (some weight); (4) desire to help other prison inmates (some weight); (5) religious commitment while in prison (some weight); (6) assisted turtles across roadways (little weight); (7) supportive family (moderate weight); (8) capable of kindness (some weight); (9) one credit hour remaining to obtain bachelor of science degree in biology (little weight); (10) sympathy for the victims' families (little weight); (11) ability to be educated and to educate others (little weight); and (12) exhibited appropriate courtroom behavior (little weight).
[8] During Rigterink's trial, his barber testified that he came in for a walk-in haircut two to three days following the murders and requested a "drastic" change in his hair style. Before the haircut, Rigterink "wore his hair long over the collar [and] over the ears." After the haircut, Rigterink's hair did not fall below his collar or cover his ears.
[9] Rigterink was married at the time of these murders but was separated from his wife and seeing another woman.
[10] Additionally, the PCSO could not exclude Rigterink as the source of the foreign DNA discovered under Jarvis's fingernails.
[11] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[12] At some point during the interrogation, Major W.J. Martin relieved and replaced Detective Rench.
[13] During the interrogation, there were at least two detectives in the room with Rigterink at all times.
[14] Rigterink's videotaped confession was not admitted into evidence or considered during the suppression hearing; rather, it was placed in evidence during Rigterink's trial. Therefore, the presentation under this heading is a more complete version of events than that presented by the State during the suppression hearing. Our later analysis contains the facts that we consider with regard to whether Rigterink was in custody for Miranda purposes.
[15] Rigterink testified that Mullins used the pronoun "we" when issuing the death threats. To Rigterink, this indicated that Mullins might have issued these threats on behalf of a larger group of individuals.
[16] Despite repeated searches, the PCSO was never able to recover this weapon.
[17] The female eyewitness also testified that the scuffling and banging in unit 1 continued for approximately one minute while she was on the phone with the 911 dispatcher, which pushes the relevant time ahead to approximately 3:09 p.m.
[18] See, e.g., Frances v. State, 970 So.2d 806, 822 (Fla.2007) (rejecting assorted Ring claims), cert. denied, ___ U.S. ___, 128 S.Ct. 2441, 171 L.Ed.2d 241 (2008)); Taylor v. State, 937 So.2d 590, 599 (Fla.2006) (noting that, time and again, this Court has "rejected the argument that the standard penalty phase jury instructions impermissibly shift the burden to the defense to prove that death is not the appropriate sentence"); Mansfield v. State, 911 So.2d 1160, 1180 (Fla.2005); Combs v. State, 525 So.2d 853, 855-58 (Fla. 1988) (rejecting Caldwell challenges to Florida's standard penalty-phase jury instructions); Ventura v. State, No. SC08-60, at 13, 2 So.3d 194, 200, 2009 WL 196379 (Fla.Jan. 29, 2009); Lightbourne v. McCollum, 969 So.2d 326, 349-53 (Fla.2007); Schwab v. State, 969 So.2d 318, 321-25 (Fla.2007) (upholding Florida's current lethal-injection protocol in the face of Eighth Amendment challenges based upon either a substantial, foreseeable, or unnecessary-risk standard).
[19] Previously, in Malloy v. Hogan, 378 U.S. 1, 6, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964), the Court held that the Self-Incrimination Clause applies to the states through section 1 of the Fourteenth Amendment.
[20] But see Dickerson v. United States, 530 U.S. 428, 432, 444, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000) (holding that Miranda was "a constitutional decision," which "may not be in effect overruled by an Act of Congress"; "Miranda announced a constitutional rule that Congress may not supersede legislatively" (emphasis supplied)).
[21] "[T]he requirement of giving Miranda warnings before custodial interrogation is a prophylactic rule intended to ensure that the uninformed or uneducated in our society know they are guaranteed the rights encompassed in the warnings." Davis v. State, 698 So.2d 1182, 1189 (Fla.1997).
[22] See Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938) (articulating the Sixth Amendment right-to-counsel waiver standard, which the Miranda Court subsequently adopted in part with regard to the waiver of the implicitly derived Fifth Amendment right to counsel).
[23] In that same opinion, the Court held that Miranda did not apply to typical traffic stops, which it assumed to be brief, non-interrogative events. However, the Court cautioned that "[i]f a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him `in custody' for practical purposes, he will be entitled to the full panoply of protections prescribed by Miranda." Berkemer, 468 U.S. at 440, 104 S.Ct. 3138 (emphasis supplied).
[24] The Miranda Court provided some insight concerning what it originally anticipated would constitute "voluntary" statements:

There is no requirement that police stop a person who enters a police station and states that he wishes to confess to a crime, or a person who calls the police to offer a confession or any other statement he desires to make. Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today.
384 U.S. at 478, 86 S.Ct. 1602 (footnote omitted).
[25] Mathiason, 429 U.S. at 495, 97 S.Ct. 711; see also Beheler, 463 U.S. at 1124-25, 103 S.Ct. 3517 (substantially similar).
[26] Again, Rigterink's videotaped confession was not placed into evidence during the suppression hearing. Instead, it was later admitted during the guilt phase of his capital trial.
[27] "Law enforcement said they had no intention at that point to detain the defendant."
[28] Cf., e.g., Schneckloth v. Bustamonte, 412 U.S. 218, 227, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) ("[T]he question [of] whether a consent to a search was in fact `voluntary' [under the Fourth Amendment] or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." (emphasis supplied)).
[29] See, e.g., Roman v. State, 475 So.2d 1228, 1231 (Fla. 1985) ("That an interrogation takes place at a station house does not by itself transform an otherwise noncustodial interrogation into a custodial one." (citing Oregon v. Mathiason, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977)) (emphasis supplied)).
[30] See, e.g., Pitts, 936 So.2d at 1126 ("As to the manner of the interrogation, the record is clear that the officers did not in any way subject Pitts to force. There is no indication that the officers ever touched Pitts. He was never handcuffed, and he was never locked in a room." (emphasis supplied)).
[31] DiGuilio, 491 So.2d at 1135.
[32] DiGuilio, 491 So.2d at 1135.
[33] The question of Rigterink's guilt or innocence remains a question for a jury, not this Court.
[34] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).